PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DENNIS P. GLYNN,

        *Plaintiff-Appellant,*

        v.

EDO CORPORATION; IMPACT
SCIENCE & TECHNOLOGY, INC.,

        *Defendants-Appellees,*

        *and*

MICHAEL CAPRARIO; FOSTER-
MILLER, INC.; DEAN PUZZO; JAMES
D. MARTIN; CADQAL DEVELOPMENT,
INC.,

        *Defendants.*

No. 12-1160

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, Senior District Judge.
(1:07-cv-01660-JFM)

Argued: December 4, 2012

Decided: March 21, 2013

Before GREGORY, AGEE, and WYNN, Circuit Judges.

Affirmed by published opinion. Judge Gregory wrote the opinion, in which Judge Agee and Judge Wynn joined.

## COUNSEL

**ARGUED:** Adam Augustine Carter, THE EMPLOYMENT LAW GROUP, PC, Washington, D.C., for Appellant. William G. Miossi, WINSTON & STRAWN, LLP, Washington, D.C., for Appellees. **ON BRIEF:** R. Scott Oswald, THE EMPLOY-MENT LAW GROUP, PC, Washington, D.C., for Appellant. Ryan S. Spiegel, Alia Ornstein, WINSTON & STRAWN, LLP, Washington, D.C., for Appellees.

## OPINION

GREGORY, Circuit Judge:

In this False Claims Act ("FCA"), 31 U.S.C. §§ 3729 - 3733, retaliation action, Plaintiff-Appellant Dennis Glynn ("Glynn") argues that Defendant-Appellee Impact Science & Technology ("IST") and its parent company, EDO Corporation, fired Glynn because he reported IST to the government for what he believed to be fraudulent conduct. We agree with the district court that Glynn was not engaged in activity that qualified him for protection under the FCA's anti-retaliation provision and affirm the grant of summary judgment to Appellees.

### I.

IST is a New Hampshire corporation that designs and manufactures counter-improvised explosive devices ("C-IEDs") for the United States government. IST hired Glynn in 2004 as an engineer after purchasing his company, Dedicated Electronics, Inc., which had previously consulted for IST. IST's line of C-IEDs includes Mobile Multi-Band Jammer systems ("MMBJs"). MMBJs jam the frequencies used to detonate the improvised explosive devices ("IEDs") that have been used with devastating effect on American troops in the wars in Iraq and Afghanistan.

Beginning in 2004, Glynn made numerous recommendations and complaints to his supervisor, Dean Puzzo, IST's Director of Information Warfare Programs, and Scott Traurig, IST's Senior Principal Systems Engineering Manager, related to what he perceived as the failure of MMBJ devices to function properly at elevated temperatures. He also complained he was not receiving clear guidance about what specifications the MMBJs were supposed to meet and that there was insufficient screening conducted on the equipment. Specifically, Glynn spoke with Traurig at least six times about the need for better specifications and temperature testing. At one point, Traurig responded that IST does not use specifications because IST has to "operate on the fly."

In April 2005, IST's government customer ("Government Customer") discovered that IST had failed to put a finalized testing plan in place and communicated to IST that its failure was "unacceptable." In August 2005, Glynn sent an email to Puzzo, Caprario, and Traurig explaining the temperature issues hobbling the jammers. He recommended a particular test to determine whether the MMBJs were operating correctly. Puzzo responded by email and communicated to Caprario and Traurig that "we should look at Dennis's recommendation very seriously."

The remainder of the facts pertinent to this case took place in 2006. In May of that year, Glynn was instructed to conduct testing on the Multi-Band Tunable Noise Source module ("MBTNS") used in the MMBJs. These modules are an important component of the MMBJs that are designed to emit a radiofrequency that jams the receivers of nearby IEDs. Traurig instructed Glynn to pass the MBTNSs only if they performed adequately at 85 degrees Celsius. Glynn viewed Traurig's 85-degree threshold as arbitrary, however, and chose to calculate his own threshold. Although the MBTNSs did not meet the 85-degree threshold Traurig had set, Glynn chose to pass them.

Further temperature testing on the MBTNSs in June revealed that one of the frequency channels, the "E-band," may generate inadequate output power under elevated temperatures to jam IED detonation signals covered by that band. To fix the problem, IST placed a corrective temperature component into the system. However, IST only applied this fix to units still in stock and not to the 800 jammers already in the field. Glynn asked Caprario to recall the MMBJs that had already been shipped and were active in the field so that IST could install the corrective component. Glynn also asked Caprario to inform the Government Customer of the temperature concerns. Caprario did neither. According to Glynn, Caprario stated that he did not want to "upset the apple cart right now," a reference, Glynn contends, to the $120 million EDO acquisition deal that was in the works at the time and was due to close in September. IST insists Caprario explained to Glynn that he would not recall any MMBJs because the MBTNS temperature issue posed no risk to the overall performance of the MMBJs.

Also in June, Glynn asked various managers at IST if he could see copies of the MMBJ contracts. On June 9, Glynn met with Lewis Dokmo, IST's Vice President, and stated his team was having trouble "sleeping at night" because of concern they were not producing their product according to contract specifications and could be endangering people's lives. Glynn expressed his opinion that the three people between Glynn and Dokmo on the IST chain of command (Traurig, Caprario, and Puzzo) were "arrogant pricks" who were spoon-feeding him misleading information. Dokmo told Glynn he could see the contracts only if he put his request in writing. However, Glynn never submitted a written request. Throughout the summer of 2006, Glynn raised his concerns to multiple people in the company about temperature issues with the MBTNS module and output power on the E-band.

On September 13, Glynn contacted Assistant U.S. Attorney Philip Halpern and told Halpern that he thought IST "was

shipping systems that . . . were putting our troops in jeopardy." Halpern connected him with FBI Agent Maurice Hattier. In a September 15 response to an e-mail entitled "Suspected Contract Fraud," Glynn stated, "[i]t is my opinion that Caprario, Traurig, and Puzzo are putting lives at risk by ignoring the temperature problems with the MMBJ systems. They all directly benefited financially from the decision to do so with the recent sale of the company." Agent Hattier referred Glynn to Agent Benjamin Hochberger of the Department of Defense Criminal Investigative Service, with whom Glynn communicated between September 2006 and February 2007. Beyond the concerns related to the functionality of MMBJs under elevated temperatures, Glynn also noted IST's perceived failure to create or implement a quality assurance plan ("QAP") for the MMBJs and alleged that IST was fraudulent in its billing practices.

On September 20, Glynn told Philip Joseph, a manager at IST, that he had reported the delivery of "faulty systems" to the government. Even though Glynn asked Joseph to keep the matter confidential, Joseph alerted IST management to Glynn's report on September 27. The next day, Caprario contacted the Government Customer to explain that one of IST's employees had made an allegation about the MMBJs.

In October, the Government Customer performed two rounds of testing on the MMBJs. Testing on October 4 revealed that MMBJs still in stock at IST that contained temperature compensation pads performed well overall. However, Glynn later told Agent Hochberger that IST did not inform the Government Customer that these units had a temperature compensation pad while units in the field did not. After Glynn explained the discrepancy, the Government Customer shipped units back from the field and conducted a second round of testing on October 20. This testing revealed that MMBJs that did not contain temperature compensation pads suffered a nine percent reduction in effective range. However, the government did not consider this range reduction significant, and

concluded that these units also passed testing. Nonetheless, in direct contravention of the Government Customer's own determination, Glynn insists these units shipped from the field failed testing.

Glynn alleges IST made the decision to terminate him on October 13, just two weeks after IST learned of Glynn's disclosure. He claims IST decided to keep him on through December because they needed him to finish work on an important new module they hoped would replace the MBTNS. IST terminated Glynn on December 14, 2006.

In 2007, Glynn sued IST and EDO for unlawful retaliation under the FCA and other claims not at issue on appeal. On cross-motions for summary judgment, the district court denied Glynn's motion and granted IST's motion. Glynn timely appeals the district court's grant of summary judgment against him.

## II.

We review a district court's grant of a motion for summary judgment de novo, applying the same legal standards as the district court. *Nader v. Blair*, 549 F.3d 953, 958 (4th Cir. 2008). Summary judgment is only appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Id.* In determining whether a genuine issue of material fact exists, we view the facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011). However, the non-moving party cannot solely rely on "mere allegations or denials of [his] pleadings." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). He must set forth specific facts that go beyond the "mere existence of a scintilla of evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III.

The FCA is designed to discourage contractor fraud against the federal government. *Mann v. Heckler Koch Defense, Inc.*, 630 F.3d 338, 342 (4th Cir. 2010). Under the FCA, private parties can bring qui tam actions in the name of the United States to enforce the provisions of the statute. 31 U.S.C. § 3730(b). In 1986, Congress amended the FCA to include an anti-retaliation provision to protect whistleblowers. False Claims Amendments Act, Pub. L. No. 99-562, 100 Stat. 3153 (1986) (codified as amended at 31 U.S.C. § 3730(h)(1)). This provision provides an action to:

> Any employee . . . discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section . . . .

31 U.S.C. § 3730(h)(1).

A successful claim for retaliation under § 3730(h) requires that the plaintiff establish three basic elements: (1) he engaged in "protected activity" by acting in furtherance of a qui tam suit; (2) his employer knew of these acts; and (3) his employer took adverse action against him as a result of these acts. *Zahodnick v. Int'l Bus. Mach. Corp.*, 135 F.3d 911, 914 (4th Cir. 1997). While the district court decided against Glynn on each of these three prongs, we limit our inquiry to the first prong because our finding that Glynn failed to offer sufficient evidence to establish he engaged in protected activity is dispositive in this case.

In his attempt to satisfy the first prong of a FCA retaliation claim, Glynn puts forward three theories: (1) he investigated and opposed IST's provision of defective MMBJ devices to the Government Customer; (2) he investigated and opposed

IST's false certification of compliance with the requirements in the MMBJ contract; and (3) he initiated government investigation of IST's fraudulent conduct. We discuss these theories in order below.

A.

Glynn first argues that he engaged in protected activity because he was investigating a potentially fraudulent act—namely that of a contractor, IST, knowingly supplying the government a substandard product. An employee need not file an actual qui tam suit to satisfy the first prong of the three-part FCA anti-retaliation test. *Mann*, 630 F.3d at 343. Because the statute protects acts "in furtherance" of a qui tam suit, actionable retaliation can occur while employees are investigating or "collecting information about a possible fraud, before they have put all the pieces of the puzzle together." *Id.* at 343-44 (quoting *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998)). We apply the objective "distinct possibility" standard to determine whether an employee has engaged in protected activity. *Eberhardt v. Integrated Design & Const., Inc.*, 167 F.3d 861, 869 (4th Cir. 1999). To pass muster under the distinct possibility standard, a plaintiff must be investigating "matters that reasonably could lead to a viable FCA action." *Id.* The employee's investigation must concern "false or fraudulent claims" or it is not protected activity under the FCA. *Id.* at 868.

There is little disagreement that Glynn diagnosed a problem with how the MBTNS modules reacted under elevated temperatures, helped to develop the temperature compensation pads as a fix for that problem, and then, adamantly disagreed with IST's decision not to recall the units in the field to install the compensation pads. He made numerous reports, recommendations, and complaints to various managers establishing his position that IST was putting troops at imminent risk by failing to recall and revamp the units in the field. Courts have held that internal reporting can rise to the level of protected

activity. *See, e.g.*, *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 514-16 (6th Cir. 2000); *Yesudian*, 153 F.3d at 741 n.9. However, as noted above, the employee must be reporting an act that reasonably could lead to a viable FCA lawsuit. *Eberhardt*, 167 F.3d at 869. Herein lies the problem with Glynn's argument: The temperature issue Glynn diagnosed and reported was not severe enough in degree to trigger any contractual obligation on IST's behalf.

The June 2006 testing that Glynn called for was module-level testing, not system-level testing. Traurig explained in a deposition that this module-level testing revealed that the E-band output under elevated temperatures was causing too many MBTNSs to fail their module-level tests prior to system-level assembly. However, the E-band power output problem did not create system-level failure. Indeed, the addition of the temperature compensation pads after the June testing may have improved the module and, as a result, the final product. But, as described below, the systems as a whole still met the Government Customer's standards.

There is a pivotal distinction here between the iterative process of product improvement and fatal performance flaws. Product improvement is part of the natural process of research and development. The diagnosis of a problem and subsequent adaptation is mere product improvement if the problem does not cause the product to fall below contractual standards of performance. A fatal performance problem, on the other hand, would cause the product to fail contractual standards.

We must safeguard a contractor's ability to make iterative improvements without compromising the utility of the product in the field at the time. As the district court noted, "the MMBJ devices were part of a quick-reaction design, development, and deployment process." *Glynn v. Impact Sci. & Tech., Inc.*, 807 F. Supp. 2d 391, 407 (D. Md. 2011). It would be unreasonable and counter-productive to expect IST to pull units out of the field every time engineers such as Glynn iden-

tify a snag or a potential improvement in the product. Such an extreme policy would cause unnecessary interruption in the use of these life-saving devices and lead to astronomical cost increases. A recall makes sense only if the system as a whole fails to pass muster, and here it did not.

Glynn argues that his extensive experience and unique knowledge of these devices substantiated a belief that the temperature problem he diagnosed was a fatal performance issue. The facts undermine his reasoning. First, Glynn himself directed an IST employee to pass an MBTNS module through temperature testing in May 2006 even though it performed at less than 85 degrees Celsius because he knew that it would not compromise the overall system's ability to meet specifications. His decision to give the green light establishes that he understood that the module-level shortcomings they were dealing with did not translate into system-level dysfunction.

Second, the October 2006 government testing in response to Glynn's relating activity does not bear out his allegations that the temperature issues caused performance failure. There were two rounds of government testing in October. The first round tested units still in IST's stock with temperature compensation pads in place. The second round tested units recalled from the field that did not have the temperature compensation pads in place. While there was some reduction in power output and several amplifier failures, the government did not find that any of the units in either round of testing failed at the system level. In fact, Glynn appeared to acknowledge there was no performance issue with the MMBJs in an e-mail to Agent Hochberger after he learned of the testing results: "I was . . . told . . . that there were failures of units in the E-Band of 1 to 2 dB. To put this in perspective, it is not a significant deviation from the specification and I am sure that [the Government Customer] was pleased with that fact."

Nonetheless, Glynn clings to the unsupported assertion that the MMBJs "failed" the October tests. He urges this Court to

find that his characterization of the October tests creates a genuine issue of material fact that a jury should resolve. It would be unreasonable for a jury to find this was a performance issue when all evidence, except for Glynn's own opinion on the matter, points to a conclusion that this was a product improvement issue. *See Guinness PLC v. Ward*, 955 F.2d 875, 901 (4th Cir. 1992) (holding that "conclusory allegations and speculative assertions . . . without further legitimate support clearly does not suffice" to create a genuine issue of material fact). Federal Rule of Civil Procedure 56 requires that the non-moving party in a motion for summary judgment set forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. Glynn has not set forth facts, but opinions. The factual evidence in this case, particularly the test results, contradict his opinions. As such, we hold Glynn's purported investigation activities did not raise a distinct possibility of a viable FCA action and are not protected.

B.

Next, Glynn argues he engaged in protected activity in furtherance of a qui tam suit based on IST's alleged false certification of compliance with government contracts. In particular, Glynn alleges that IST falsely certified that it had complied with contractual obligations to report defects to the Government Customer and that it maintained a quality assurance plan. To establish liability under a false certification theory, the plaintiff must show that "a government contract or program required compliance with certain conditions as a prerequisite to a government benefit, payment, or program; the defendant failed to comply with those conditions; and the defendant falsely certified that it had complied with the conditions in order to induce the government benefit." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 786 (4th Cir. 1999).

As explained above, the temperature-related issues with the MBTNS modules were product improvement problems that

did not trigger any reporting requirement. IST was only contractually required to report performance issues to the Government Customer. Our conclusion on this point defeats any claim that IST falsely certified compliance by failing to report the temperature issues to the Government Customer.

However, we need to separately address the false certification claim in the context of the QAP. The district court found that Glynn's false certification theory was essentially dead on arrival because he never actually reviewed the contracts. While Glynn did ask to see the contracts during a meeting with Lewis Dokmo, Dokmo told Glynn that he would have to put the request in writing—a step Glynn never took. Nonetheless, Glynn asserts that it does not matter whether he actually saw the contract, but rather whether he held a reasonable belief that IST was falsely certifying compliance with contractual specifications. He argues his experience in government contracting "led him to believe that the contract between IST and its military customer would have detailed specifications, [and] would require IST to maintain a quality assurance plan . . . ."

The fact that Glynn never actually saw the contracts is not dispositive. While we noted in dicta in *Mann* that the fact the plaintiff had not seen the bid specifications he was challenging "cast[ ] some doubt upon his claims," there is nothing in that opinion that categorically requires that a plaintiff have firsthand knowledge of a contract to bring a FCA claim. *See* 630 F.3d at 345. Glynn argues persuasively that such a requirement would allow employers to insulate themselves by prohibiting employees from ever accessing contractual documents. Circumstantial evidence can raise a distinct possibility of a viable FCA action even where an employee does not have access or has not actually viewed the contractual documents. Here, Glynn's nineteen years of working for defense contractors and substantial time running his own business provided the context for his objectively reasonable belief that IST should have had a QAP in place.

In rejecting the false certification theory, the district court also cited Glynn's admission that when he reported his concerns to the government regarding compliance with the contract, he "didn't know whether or not it was a problem with IST or whether or not it was a problem at [the Government Customer]," but only that the result was "systems that would likely put our troops in harm's way." *Glynn*, 807 F. Supp. 2d at 409. The distinct possibility test does not require that the relator have all the puzzle pieces in place. *Mann*, 630 F.3d at 343-44. It only requires that he take acts in furtherance of a qui tam suit. 31 U.S.C. § 3730(h). Glynn's uncertainty does not defeat his effort to satisfy the distinct possibility test.

The district court also explained that the fact that Glynn had given a boilerplate QAP to Caprario and had seen a modified version of the plan around the copy machine "severely undermined" the objective reasonableness of Glynn's belief that IST did not have a QAP in place. *Glynn*, 807 F. Supp. 2d at 410. On this point, the district court misconstrues its role at the summary judgment phase. This evidence is just as likely to support the conclusion that IST did not have a QAP in place. It makes equal sense that IST would ask Glynn for a boilerplate precisely because it did not have an adequate quality control plan in operation. If there was a modified version of the boilerplate on the copy machine, then it would be reasonable to infer that IST was working on, but had not completed or implemented, a QAP.

The evidence provides sufficient support for the conclusion that IST did not have a QAP in place. An April 2005 email exchange between redacted parties illustrates that the Government Customer was upset that IST only had a *draft* QAP in place at the time, noting that "[i]t doesn't seem appropriate to only have a draft test plan for inspection that is currently ongoing." The email cites to a contractual provision: "In accordance with SOW 3.3.1, IST shall conduct quality conformance inspections and tests. . . ." Further, deposition statements by Dokmo, Rice, and Murrin all support Glynn's

assertion that IST did not have a QAP in place for the MMBJs in 2006.

Before concluding that Glynn engaged in protected activity, however, we must assess whether any false certification related to quality assurance was material. A false certification is only material and actionable if it has a "natural tendency" to influence the government's decision to pay for the contracted service. 31 U.S.C. § 3729(a)(1)(G); *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370 (4th Cir. 2008); *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 914 (4th Cir. 2003). The issue of materiality is a mixed question of law and fact to be decided by the court. *Harrison*, 352 F.3d at 914. However, the district court here did not reach the question of materiality because it found there had been no false certification.

We hold that any false certification related to IST's failure to establish a QAP is not material.[1] As the redacted e-mail cited above explains, the government considered IST's shortcomings in quality assurance to be a serious problem and a contractual violation. However, most of the unredacted contractual language available in the record pertaining to quality assurance required IST to perform inspections and testing. The record establishes that while IST may not have had a finalized, consolidated QAP in place, it engaged in testing at both the modular and systems level. Indeed, Glynn himself was involved in that testing and the results-based efforts to improve the quality of the MMBJs.

IST may not have submitted a finalized QAP to the Government Customer in strict accordance with its contractual obligations. But, every contractual breach is not a basis for a FCA action. *U.S. ex rel. Owens v. First Kuwaiti Gen. Trading*

---

[1]Although we disagree with the district court's reasoning, we can affirm the district court's decision on any grounds apparent from the record. *United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005).

*& Contracting Co.*, 612 F.3d 724, 726 (4th Cir. 2010) ("Congress crafted the FCA to deal with fraud, not ordinary contractual disputes."). Any failure here was likely administrative. We cannot find it to be a material false certification when IST was actively engaged in the testing that lies at the heart of any quality assurance program.

### C.

Finally, Glynn argues that he engaged in protected activity because he initiated a government investigation. The FCA protects an employee who "suppl[ies] information that set[s] off an investigation." *Neal v. Honeywell, Inc.*, 33 F.3d 860, 864 (7th Cir. 1994). However, there must be a distinct possibility that the investigation the employee triggers with his disclosure will lead to a viable FCA action. *Id.*

There is little question that Glynn successfully triggered an investigation by the DOD Criminal Investigative Service. Agent Hochberger communicated with Glynn for several months to discuss his agency's investigation of IST and implied that his agency was partially responsible for recalling the units in the field for testing.

When Glynn contacted the government, he complained about IST's failure to recall the MMBJs from the field, perceived testing deficiencies, the lack of a QAP, IST's decision not to inform the Government Customer of reductions in range capacity at elevated temperatures, and false billing. As explained in the two previous sections, these complaints do not raise a distinct possibility of a viable FCA claim.[2] While Glynn may have perked the government's ears, he had no protected basis for doing so under the FCA.

---

[2]Glynn's false billing claim is unsupported by any evidence outside of Glynn's bald assertions, which are not enough to survive summary judgment. *Guinness PLC*, 955 F.2d at 901.

## IV.

For the reasons stated above, we affirm the decision of the district court.

*AFFIRMED*