**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-2482

ROGER HOSCHAR, and JUDY HOSCHAR,

Plaintiffs – Appellants,

v.

APPALACHIAN POWER COMPANY,

Defendant – Appellee,

and

INDUSTRIAL CONTRACTORS, INC.,

Defendant.

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington. Robert C. Chambers, Chief District Judge. (3:11-cv-00152)

Argued: November 6, 2013              Decided: January 7, 2014

Before GREGORY, DAVIS, and THACKER, Circuit Judges.

Affirmed by published opinion. Judge Thacker wrote the opinion, in which Judge Gregory and Judge Davis joined.

**ARGUED**: Alexander Deane McLaughlin, THE CALWELL PRACTICE, PLLC, Charleston, West Virginia, for Appellants. Daniel Rhys Michelmore, JACKSON KELLY PLLC, Pittsburgh, Pennsylvania, for Appellee. **ON BRIEF**: John Skaggs, THE CALWELL PRACTICE, PLLC, Charleston, West Virginia, for Appellants. Brian R. Swiger,

Michael P. Leahey, JACKSON KELLY PLLC, Charleston, West Virginia, for Appellee.

_____

THACKER, Circuit Judge:

Appellants, Roger and Judy Hoschar (collectively "Appellants"), filed this civil action in the Circuit Court of Mason County, West Virginia, against Appellee, Appalachian Power Company ("APCO"), and Defendant, Industrial Contractors, Inc. ("ICI"), seeking damages for an infectious lung disease called histoplasmosis that Roger Hoschar ("Mr. Hoschar") allegedly contracted while working as a boilermaker at one of APCO's coal-fired power plants. APCO removed the case to the United States District Court for the Southern District of West Virginia on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332. Appellants, West Virginia residents, sought to remand the action to state court, arguing that APCO's principal place of business is in Charleston, West Virginia, and that complete diversity is therefore lacking. The district court denied Appellants' motion, concluding that under the "nerve center" test, APCO's principal place of business is in Columbus, Ohio. After discovery, the district court awarded summary judgment to APCO, holding that, pursuant to West Virginia law, APCO did not owe a duty to Mr. Hoschar.

In this appeal, Appellants challenge both the district court's denial of the motion to remand and the district court's grant of APCO's motion for summary judgment. Because the record amply demonstrates that the location where APCO's officers

3

direct, control, and coordinate APCO's activities is Columbus, Ohio, we conclude that APCO has carried its burden of establishing federal subject matter jurisdiction. With respect to APCO's motion for summary judgment, we hold that APCO did not have actual or constructive knowledge of a potential histoplasmosis risk, and therefore, APCO did not owe Mr. Hoschar a duty to guard against it. Accordingly, we affirm.

I.

A.

APCO owns the Philip Sporn power plant ("Sporn") near New Haven, West Virginia. Sporn is a coal-fired power plant, generating electricity by burning coal to create steam and then passing the steam through a turbine. The power plant has five "precipitators," which remove granular ash particles ("fly ash") from the gasses produced by burning coal. When in operation, a precipitator generates significant heat, which can cause corrosion to its exterior steel siding and result in fly ash leakage.

ICI was hired by APCO to perform general maintenance at Sporn, which included welding metal patches to the exterior of the precipitators to prevent fly ash leakage. Mr. Hoschar was a boilermaker employed by ICI from March 2006 to March 2007. During that time, he worked exclusively at Sporn. His typical maintenance assignment consisted of hanging from a "pick" --

4

that is, a suspended platform like those used by window washers -- and welding steel patches over corroded portions of the ducts leading into and out of the Unit 5 precipitator ("Unit 5"). During his time at Sporn, Mr. Hoschar frequently worked in and around Unit 5, spending (by his estimate) at least five months there. Of note, he did not spend five consecutive months working on Unit 5. Rather, according to Mr. Hoschar's work records, he spent a total of 66 days performing elevated welding work on the exterior of Unit 5 over the course of 13 months.

Before welding any steel patches, Mr. Hoschar and other workers had to remove debris that had built up in the steel channels. Because Unit 5 is an outdoor structure, pigeons sometimes perched on its steel channels and left their droppings behind. Therefore, the debris usually consisted of approximately three to four inch accumulations of bird manure and two inch accumulations of fly ash. Mr. Hoschar removed the debris from the steel channels either by hand, with a wire brush, or using compressed air. When removing debris and while welding the steel patches, Mr. Hoschar wore a respirator over his face.

In March 2007, Mr. Hoschar was terminated from his employment with ICI. In 2009, as part of a routine pre-operative test before Mr. Hoschar underwent knee surgery, which was unrelated to his work at Sporn, a chest x-ray revealed the

5

presence of a mass on his right lung. Mr. Hoschar's physician feared the mass was cancerous and recommended he undergo a lobectomy to remove the portion of his lung containing the mass. After a portion of Mr. Hoschar's lung was removed, a biopsy revealed that the mass was not cancer, but instead was a disease called histoplasmosis.

Histoplasmosis is an infectious disease caused by inhaling the spores of a naturally occurring soil-based fungus called histoplasma capsulatum. The histoplasma capsulatum fungus is endemic in the Ohio Valley region, in which Sporn is located, because it grows best in soils with high nitrogen content. Once an individual inhales the fungus, it colonizes the lungs. However, the vast majority of people infected by histoplasmosis do not experience any symptoms of infection or suffer any ill effects.

While Mr. Hoschar was working at Sporn, the Occupational Safety and Health Administration ("OSHA") website maintained a page entitled, "Respiratory Protection: Hazard Recognition." One of the reference documents found on that page was a publication by the National Institute for Occupational Safety and Health ("NIOSH") called, "Histoplasmosis: Protecting Workers at Risk" (the "NIOSH Publication"). The NIOSH Publication explained that the histoplasma capsulatum fungus "seems to grow best in soils having a high nitrogen content,

6

especially those enriched with bird manure or bat droppings." J.A. at 1052.[1] It further noted that the fungus "can be carried on the wings, feet, and beaks of birds and infect soil under roosting sites or manure accumulations inside or outside buildings." Id.

B.

On January 31, 2011, Appellants sued APCO and ICI for negligence in the Circuit Court for Mason County, West Virginia, seeking damages for Mr. Hoschar's histoplasmosis infection. Appellants allege Mr. Hoschar contracted histoplasmosis while working at Sporn as a result of inhaling contaminated dust when he swept out the mixtures of bird manure and fly ash that had accumulated in Unit 5's steel channels. Appellants also allege APCO did not provide any written or verbal warnings concerning the presence of aged bird manure around Unit 5 or of the health risks associated with accumulations of bird manure, such as histoplasmosis.

On March, 9, 2011, APCO removed this action to the United States District Court for the Southern District of West Virginia pursuant to 28 U.S.C. § 1332, explaining that APCO's principal place of business is in Columbus, Ohio, and complete

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

diversity therefore exists between Appellants and APCO and ICI.[2] Appellants filed a motion to remand the case to state court on March 14, 2011, arguing that APCO's principal place of business is in Charleston, West Virginia, and complete diversity is thus lacking.

C.

Prior to the initiation of this lawsuit, Appellants' counsel -- representing other clients (also West Virginia residents) in a different case also pending in the Southern District of West Virginia against APCO -- took the deposition of Mark Dempsey, APCO's Vice President of External Affairs. The deposition was conducted pursuant to Federal Rule of Civil Procedure 30(b)(6), which required APCO to designate a representative to testify about topics relating to APCO's principal place of business. After taking the deposition, plaintiff's counsel in that case filed a motion to remand the action to West Virginia state court. That case settled, however, before a decision on the motion to remand was issued. Because the same jurisdictional issue arises in this litigation, Appellants attached Dempsey's Rule 30(b)(6) deposition taken in the other case to his motion to remand in this case. In

_____

[2] ICI is an Indiana corporation with its principal place of business in Indiana. ICI's principal place of business was never in dispute.

8

opposing Appellants' motion, APCO submitted an affidavit from Dempsey. The following description of the facts relevant to APCO's principal place of business is based on Dempsey's deposition testimony and his affidavit.

APCO -- a subsidiary of American Electric Power Company ("AEP") -- is incorporated in Virginia and maintains offices in Charleston, West Virginia and Columbus, Ohio.

In his deposition, Dempsey testified that the Charleston office is an "administrative office," but "[they] refer to it as headquarters." J.A. 86. In fact, APCO's website lists Charleston as its headquarters. With respect to APCO's Charleston office being referred to as APCO's "headquarters," Dempsey testified, "headquarters is probably a misnomer when applied to APCO." Id. at 107. He explained that it became known as the headquarters simply because APCO's former president, Dana Waldo, lived in Charleston. Waldo is no longer employed by APCO.

According to Dempsey, of APCO's 27 officers, only the following five officers work in the Charleston office. Charles Patton, APCO's President and Chief Operating Officer, oversees and directs all aspects of APCO's day-to-day operations from Charleston. He coordinates the allocation of APCO's resources as well as APCO's communication with employees and the public. With respect to the employees who report directly to him, Patton

9

performs a number of administrative tasks, including evaluating job performance and assigning goals. Patton also acts as APCO's chief representative with the regulatory agencies in West Virginia, Virginia, and Tennessee. In addition to Patton, Philip Wright, APCO's Vice President of Distribution, is responsible for overseeing APCO's electricity distribution operation, which involves the actual delivery of electricity to residential and business customers. Dempsey himself interacts with state and local governments and monitors legislation that affects APCO's business. Jeff LaFleur, APCO's Vice President of Generating Assets, oversees the operation of APCO's power plants. Lastly, Chris Potter, APCO's Vice President of Regulatory Affairs, oversees APCO's regulatory operations in West Virginia, Virginia, and Tennessee.

The remaining 22 out of APCO's 27 officers maintain their offices in Columbus, Ohio. These officers include the Chief Executive Officer, Chief Financial Officer, Secretary, and Treasurer. In addition, all nine of APCO's directors are based in Columbus. From its Columbus office, APCO's officers are responsible for: deciding the location and construction of power plants and transmission lines; operating hydroelectric facilities, pump storage facilities, coal-fired power plants, and gas power plants; negotiating and executing contracts for the procurement of fuel for those generating plants; handling

10

environmental permitting for work at APCO's West Virginia generating plants; negotiating and executing contracts to purchase fleet vehicles; collecting and disbursing revenues; calculating and paying taxes owed on its West Virginia facilities; controlling and directing filings made with the Securities and Exchange Commission (the "SEC") and the Federal Energy Regulatory Commission (the "FERC"); determining human resource policies and codes of conduct; and overseeing APCO's legal affairs.

The district court considered these facts and denied Appellants' motion to remand, finding that Columbus, Ohio, is APCO's principal place of business. The court explained that although "many of the day-to-day business activities of [APCO] are conducted in Charleston[,] . . . the ultimate decision-making power, which directs, controls, and coordinates the big-picture activities of [APCO], is carried out in Columbus." Hoschar v. Appalachian Power Co., No. 3:11-152, 2011 WL 1671636, at *4 (S.D. W. Va. May 3, 2011) (J.A. 172-73). Therefore, the district court concluded that complete diversity existed between the parties and that federal jurisdiction was proper.

After the completion of discovery, APCO and ICI filed separate motions for summary judgment, which the district court

11

granted on November 30, 2012.[3]  See Hoschar v. Appalachian Power Co., 906 F. Supp. 2d 560, 567, 570 (S.D. W. Va. 2012) (J.A. 1366-67, 1372).  With respect to APCO's motion for summary judgment, the district court held that, as a matter of law, the histoplasmosis hazard posed by the accumulations of aged bird manure was not reasonably foreseeable to APCO, and APCO therefore did not owe Mr. Hoschar a duty to protect against it. See Hoschar, 906 F. Supp. 2d at 567 (J.A. 1366).  Appellants timely appealed both the district court's denial of the motion to remand and the district court's grant of APCO's motion for summary judgment.  We possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

"Like all questions implicating the subject matter jurisdiction of the federal courts, we review de novo the denial of a motion to remand to state court."  Lontz v. Tharp, 413 F.3d 435, 439 (4th Cir. 2005) (citing Dixon v. Coburg Dairy, Inc., 369 F.3d 811, 815-16 (4th Cir. 2004) (en banc)).  The burden of establishing federal subject matter jurisdiction "is placed upon the party seeking removal."  Mulcahey v. Columbia Organic Chemicals Co., 29 F.3d 148, 151 (4th Cir. 1994) (citing Wilson

---

[3] Appellants settled their case with ICI prior to briefing this appeal. Therefore, ICI is no longer a party to this litigation.

12

v. Republic Iron & Steel Co., 257 U.S. 92, 97 (1921)). "We review the district court's factual findings with respect to jurisdiction for clear error." Velasco v. Gov't of Indonesia, 370 F.3d 392, 398 (4th Cir. 2004).

"We review a district court's grant of a motion for summary judgment de novo, applying the same legal standards as the district court." Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "In determining whether a genuine issue of material fact exists, we view the facts and draw all reasonable inferences in the light most favorable to the non-moving party." Glynn, 710 F.3d at 213. However, to show that a genuine issue of material fact exists, the non-moving party "must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

## III.

The threshold issue we must resolve is whether the federal courts have subject matter jurisdiction over this dispute. Appellants contend that in analyzing this question, the district court erroneously held that complete diversity existed among the parties after incorrectly concluding that

13

APCO's principal place of business is in Columbus, Ohio, rather than in Charleston, West Virginia. Appellants argue that the district court incorrectly applied the "nerve center" test, as set forth by the Supreme Court in Hertz Corp. v. Friend, 559 U.S. 77, 92-93 (2010). According to Appellants, both they and APCO are West Virginia citizens, which means diversity jurisdiction does not exist. We disagree.

A.

Although originally filed in West Virginia state court, APCO removed this action to federal court pursuant to 28 U.S.C. § 1441. Section 1441 provides, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant . . . to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

APCO's claimed basis for federal subject matter jurisdiction in support of removal was diversity of citizenship. Pursuant to 28 U.S.C. § 1332, a federal district court has original jurisdiction over all civil actions between citizens of different states where the amount in controversy exceed $75,000. 28 U.S.C. § 1332(a)(1). Section 1332 requires complete diversity among the parties, meaning the citizenship of each plaintiff must be different from the citizenship of each

14

defendant.  See Caterpillar Inc. v. Lewis, 519 U.S. 61, 68 (1996).  For purposes of diversity jurisdiction, "a corporation shall be deemed to be a citizen of every State . . . by which it has been incorporated and of the State . . . where it has its principal place of business."  28 U.S.C. § 1332(c)(1).

In determining a corporation's principal place of business, we previously employed two tests: the nerve center test and the place of operations test.  See Athena Auto., Inc v. DiGregorio, 166 F.3d 288, 290 (4th Cir. 1999).  However, the Supreme Court in Hertz definitively held that, for purposes of diversity jurisdiction, a corporation's principal place of business is its "nerve center."  Hertz, 559 U.S. at 80-81. Accordingly, we apply the nerve center test to determine whether APCO's principal place of business is in Charleston, West Virginia or Columbus, Ohio.

In Hertz, the Supreme Court rejected the more general "business activities test," which measured the amount of business a corporation conducted in a particular state to determine its principal place of business.  See Hertz, 599 U.S. at 93.  The Court explained, "administrative simplicity is a major virtue in a jurisdictional statute," and the nerve center approach "is simple to apply comparatively speaking."  Id. at 94-95 (emphasis in original).  Nevertheless, the Supreme Court recognized that there will be "hard cases."  Id. at 95.  For

15

instance, "in this era of telecommuting, some corporations may divide their command and coordinating functions among officers who work at several different locations, perhaps communicating over the Internet." Id. at 95-96. Even under these circumstances, however, the nerve center test "points courts in a single direction, towards the center of overall direction, control, and coordination." Id. at 96. Although the nerve center test will not, in all instances, "automatically generate a result," it nonetheless "provides a sensible test that is relatively easier to apply." Id.

As the Supreme Court explained, "the phrase 'principal place of business' refers to the place where the corporation's high level officers direct, control, and coordinate the corporation's activities." Hertz, 559 U.S. at 80. This is the corporation's "nerve center." Id. at 80-81. While the Court noted that in practice, the nerve center "should normally be the place where the corporation maintains its headquarters," for a headquarters to qualify as the nerve center, it must be "the actual center of direction, control, and coordination, . . . and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who had traveled there for the occasion)." Id. at 93. Similarly, if the record reveals attempts at jurisdictional manipulation -- "for example, that the alleged 'nerve center' is nothing more

16

than a mail drop box, a bare office with a computer, or the location of an annual executive retreat" -- courts should analyze "the place of actual direction, control, and coordination, in the absence of such manipulation." Id. at 97.

The Supreme Court acknowledged that the nerve center test "may in some cases produce results that seem to cut against the basic rationale for 28 U.S.C. § 1332." Hertz, 599 U.S. at 96. As an illustration, the Court explained:

> [I]f the bulk of a company's business activities visible to the public take place in New Jersey, while its top officers direct those activities just across the river in New York, the "principal place of business" is New York. One could argue that members of the public in New Jersey would be less likely to be prejudiced against the corporation than persons in New York -- yet the corporation will still be entitled to remove a New Jersey state case to federal court. And note too that the same corporation would be unable to remove a New York state case to federal court, despite the New York public's presumed prejudice against the corporation.

Id. (emphasis in original). Despite "such seeming anomalies," we must accept them "in view of the necessity of having a clearer rule." Id. Indeed, "[a]ccepting occasionally counterintuitive results is the price the legal system must pay to avoid overly complex jurisdictional administration while producing the benefits that accompany a more uniform legal system." Id.

To date, the only decision from this Circuit to apply Hertz is Central West Virginia Energy Co. v. Mountain State

17

Carbon, LLC, 636 F.3d 101 (4th Cir. 2011). The plaintiff in Mountain State Carbon was a West Virginia corporation, and it brought suit in federal court on the basis of diversity jurisdiction. Id. at 102, 103. One of the defendants, Severstal Wheeling, filed a motion to dismiss due to a lack of complete diversity, arguing that its principal place of business was in Wheeling, West Virginia. Id. at 103. We applied Hertz's nerve center test and held that Severstal Wheeling's principal place of business was in Dearborn, Michigan, which was where the majority of corporate officers were located and where those officers were responsible for oversight and strategic decision-making. Id. at 105-06.

In support of our holding in Mountain State Carbon, we focused particularly on the location with a critical mass of controlling corporate officers, observing that "[s]even of Severstal Wheeling's eight corporate officers -- including its chief executive officer, chief operating officer, chief financial officer, and general counsel and secretary -- all maintain their offices in Dearborn, Michigan." 636 F.3d at 105. "Only the eighth corporate officer, a vice president and general manager, maintains his office in Wheeling, West Virginia." Id. As such, we explained that even though the "day-to-day" operations are conducted in Wheeling, Severstal Wheeling has "fail[ed] to show . . . how any of this is relevant to the

18

'nerve center' test under Hertz." Id. We concluded that if a corporation's day-to-day operations are managed in one state, while its officers make significant corporate decisions and set corporate policy in another, the principal place of business is the latter. See id. at 106.

B.

In view of the legal principles outlined above, we conclude APCO has met its burden of establishing federal subject matter jurisdiction. In this case, the record demonstrates that the place where APCO's "officers direct, control, and coordinate the corporation's activities" is Columbus, Ohio. Hertz, 559 U.S. at 92-93.

APCO's entire Board of Directors is located in Columbus. Additionally, from its office in Columbus, 22 out of APCO's 27 officers -- including its Chief Executive Officer, Chief Financial Officer, Secretary, and Treasurer -- make significant corporate decisions and set corporate policy such that they direct, control, and coordinate APCO's activities. Together, they decide the location and construction of power plants and transmission lines, and they negotiate and execute contracts for the procurement of fuel for APCO's hydroelectric facilities, pump storage facilities, coal-fired power plants, and gas power plants; all of which are decisions at the core of APCO's business. The Columbus officers handle environmental

19

permitting for work at APCO's West Virginia facilities and calculate and pay taxes owed on these facilities. Moreover, they collect and disburse revenues, control and direct the filings made with the SEC and the FERC, determine human resource policies and codes of conduct, and oversee APCO's legal affairs.

On the other hand, only five out of APCO's 27 officers are based in Charleston, West Virginia. The Charleston officers are responsible for implementing the large-scale directives received from Columbus and for managing APCO's day-to-day operations in West Virginia, Virginia, and Tennessee. For example, Patton oversees all aspects of APCO's day-to-day operations. Wright oversees APCO's distribution operations group -- that is, "the guys in the line trucks and the service trucks." J.A. 77. Dempsey interacts with state and local government and monitors legislation, while LaFleur oversees the operation of APCO's power plants. And, finally, Potter oversees the regulatory operations in West Virginia, Virginia, and Tennessee.

The responsibilities of APCO's Charleston-based officers are exactly the kinds of "day-to-day operations and public interface" that we found insufficient in Mountain State Carbon to support a finding that West Virginia is the corporation's nerve center. See Mountain State Carbon, 636 F.3d at 106. Indeed, the corporation's day-to-day operations are not

20

"relevant to the 'nerve center' test under Hertz."  Id. at 105. When a corporation's day-to-day operations are managed in one state and its officers make significant corporate decisions and set corporate policy in another, the corporation's nerve center and principal place of business is the latter.  See id. at 106. The record demonstrates that APCO's day-to-day operations are managed in Charleston, while its officers direct, control, and coordinate APCO's activities from Columbus.  Therefore, APCO's principal place of business is in Columbus, Ohio.

Appellants further contend the district court misapplied the nerve center test by looking to the location of "ultimate" control over APCO's activities, rather than the location of "actual" control over APCO's activities.  See Appellants' Br. 13-14.  This is a distinction without a difference.  First, looking to the location of ultimate control over a corporation's activities is not inconsistent with Hertz. This is because ultimate control is actual control, provided that ultimate control amounts to directing, controlling, and coordinating the corporation's activities.  See Hertz, 559 U.S. at 95-96 (explaining that some corporations "divide their command" among different locations but that the nerve center test "points courts in a single direction, towards the center of overall direction, control, and coordination" (emphasis supplied)).

21

Moreover, the Supreme Court's use of the word "actual" was simply in the context of distinguishing a nominal nerve center from a legitimate nerve center. See Hertz, 559 U.S. at 93 (explaining that normally the corporation's nerve center is its headquarters, "provided that the headquarters is the actual center of direction, control, and coordination . . . and not simply an office where the corporation holds its board meetings" (emphasis supplied)); id. at 97 (explaining that "if the record reveals attempts at [jurisdictional] manipulation[,] . . . the courts should instead take as the 'nerve center' the place of actual direction, control, and coordination" (emphasis supplied)). Therefore, under either phrasing, APCO's principal place of business is in Columbus, Ohio, because that is the location where APCO's officers direct, control, and coordinate its activities -- actually and ultimately.[4]

---

[4] It is of no consequence that APCO's parent company maintains its headquarters in Columbus. See Mountain State Carbon, 636 F.3d at 107 ("[A]lmost all of Severstal Wheeling's own officers work out of Dearborn, Michigan, as do some of its directors. That they may do so from a building owned by Severstal Wheeling's parent company is irrelevant. And the fact that they may also be engaged in affiliated companies' business activities is also of no import."). Of course, we do not automatically impute a parent corporation's principal place of business to its subsidiary. Instead, we focus on the location of direction, control, and coordination of the subsidiary's activities.

Finally, Appellants argue that APCO's nerve center must be Charleston because some of APCO's officers have referred to the Charleston office as the company's "headquarters." And, indeed, APCO's website lists Charleston as its headquarters. However, Dempsey's Rule 30(b)(6) deposition clarified that the use of the term "headquarters" to refer to APCO's Charleston office was a misnomer. Rather, as Dempsey's affidavit makes clear, the "headquarters-type" decisions -- that is, setting the overarching direction and control of APCO -- occur in Columbus. To hold otherwise would run afoul of Hertz.

As the Supreme Court in Hertz explained, "in practice [a corporation's nerve center] should normally be the place where the corporation maintains its headquarters -- provided that the headquarters is the actual center of direction, control, and coordination." 599 U.S. at 93 (emphasis supplied). But "normally" does not mean "always," and there is nothing in Hertz to suggest that a company cannot refer to one office as its "headquarters" while maintaining its "nerve center" in another office. Cf. Mountain State Carbon, 636 F. 3d at 105 n.2 (considering a newspaper article, which referred to Wheeling, West Virginia, as the corporation's headquarters, and citing Hertz to explain that "[s]uch materials, however, do not convert Wheeling, West Virginia into the place where the corporation's

high level officers direct, control, and coordinate the corporation's activities" (internal quotation marks omitted)).

Therefore, the focus remains on the location of direction, control, and coordination of the corporation's activities. Because the record demonstrates that APCO's Columbus officers are responsible for directing, controlling, and coordinating APCO's activities, we conclude that, pursuant to the nerve center test, APCO's principal place of business is in Columbus, Ohio, and the parties are thus completely diverse.

IV.

Having concluded that the federal courts have subject matter jurisdiction over this dispute, we must decide whether the district court erred by granting APCO's motion for summary judgment. The district court held that, as a matter of law, APCO did not have actual or constructive knowledge that the bird manure on its premises presented a potential histoplasmosis risk, and that APCO therefore did not owe Mr. Hoschar a duty to protect against it. We agree.

Appellants have asserted a negligence claim against APCO based on premises liability under West Virginia law. To prevail on such a claim, a plaintiff must show: (1) the owner owed a duty to the person injured; (2) that duty was breached; and (3) the breach of the duty proximately caused (4) an injury. Senkus v. Moore, 535 S.E.2d 724, 727 (W. Va. 2000). As the

24

district court correctly concluded, APCO did not owe Mr. Hoschar a duty of care as a matter of law.

Under West Virginia law, the question of whether a duty is owed turns on the foreseeability of harm. As the Supreme Court of Appeals of West Virginia has made clear, "[t]he ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised." Syl. Pt. 3, Sewell v. Gregory, 371 S.E.2d 82 (W. Va. 1988).[5] "The test is, would the ordinary man in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?" Id.

In the employment context, an employer owes a duty to provide a "reasonably safe place to work" to employees of independent contractors who are on the premises. Pasquale v. Ohio Power Co., 418 S.E.2d 738, 751 (W. Va. 1992). "This duty includes the duty to warn of latent defects existing before the work is started that are known to the employer, but are not readily observable by the employee." Id. It is well-settled that "before [a premises] owner can be liable under a negligence

---

[5] Pursuant to West Virginia's Constitution, the Supreme Court of Appeals of West Virginia articulates new points of law through its syllabus. See Walker v. Doe, 558 S.E.2d 290, 296 (W. Va. 2001) (citing W. Va. Const. art. VIII, § 4).

25

theory, he must have had actual or constructive knowledge of the defective condition which caused the injury." <u>Hawkins v. U.S. Sports Ass'n, Inc.</u>, 633 S.E.2d 31, 35 (W. Va. 2006) (per curiam).

In this case, Appellants argue that the existence and availability of the NIOSH Publication provided APCO with knowledge of the danger of histoplasmosis, which gave rise to a duty owed to Mr. Hoschar. The NIOSH Publication, which appeared on OSHA's website while Mr. Hoschar was working at Sporn, explained that the histoplasma capsulatum fungus "seems to grow best in soils having a high nitrogen content, especially those enriched with bird manure or bat droppings." J.A. 1052. It further noted that the fungus "can be carried on the wings, feet, and beaks of birds and infect soil under roosting sites or manure accumulations inside or outside buildings." <u>Id.</u> Aside from the mere existence of the NIOSH Publication on OSHA's website, however, Mr. Hoschar has offered zero evidence that APCO had actual or constructive knowledge of the NIOSH Publication itself or that APCO had actual or constructive knowledge that the histoplasma capsulatum fungus was associated with accumulations of bird manure.

Turning first to actual knowledge, there is no evidence that APCO employees actually knew that the histoplasma capsulatum fungus is associated with accumulations of bird

26

manure. Of course, there is evidence that APCO and its employees knew that birds were present at Sporn and that those birds left accumulations of manure at Unit 5. However, knowledge of the existence of birds and their manure does not mean that APCO actually knew that the histoplasma capsulatum fungus was present at Sporn. See, e.g., Mowry v. Schmoll, 441 F.2d 1271, 1273 (8th Cir. 1971) (holding defendants' general knowledge of the histoplasmosis disease "cannot in any way constitute evidence that the defendants knew or should have known that the attic would contain spores from the fungus"); Henderson v. Volpe-Vito, Inc., No. 266515, 2006 WL 1751832, at *3 (Mich. Ct. App. June 27, 2006) (unpublished per curiam) (determining that landowner's acknowledgement of the presence of geese and their feces did not "attenuate into an implied knowledge of the fungus, the spores[,] and the dangerous condition of [landowner]'s land"). Indeed, Appellants' own experts could not definitively say that the histoplasma capsulatum fungus actually existed at Sporn, and Appellants did not conduct any tests to determine whether it was, in fact, actually present there. Therefore, APCO did not have actual knowledge that the bird manure on its premises presented a potential histoplasmosis risk.

Turning next to constructive knowledge, Appellants argue that because the NIOSH Publication was disseminated

through various means and was generally available to APCO, the risk of histoplasmosis was foreseeable to APCO and gave rise to a duty to at least warn Mr. Hoschar of the bird manure and the risk of histoplasmosis. The mere existence of the NIOSH Publication, however, is insufficient. Indeed, APCO cannot be charged with knowledge of what is contained within the NIOSH Publication if APCO had no reason to even be aware of its existence. See Black's Law Dictionary (9th ed. 2009) (defining constructive knowledge as "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person."). Without any evidence that APCO was aware or should have been aware of the NIOSH Publication or its contents, APCO could not have constructive knowledge that the bird manure on its premises may have presented a potential histoplasmosis risk.

Nevertheless, Appellants contend that the question of whether APCO knew or should have known of a histoplasmosis hazard on its premises is necessarily a factual determination that must be made by a jury in every instance. Contrary to Appellants' assertion, however, this question does not automatically go to a jury. The determination of whether APCO had actual or constructive knowledge of a histoplasmosis risk relates to whether a legal duty was owed to Mr. Hoschar in the first place. See Hawkins, 633 S.E.2d at 35 ("[B]efore an owner

28

can be liable under a negligence theory, he must have had actual or constructive knowledge of the defective condition which caused the injury."). It is true that often, whether or not an individual has actual or constructive knowledge of a risk is a question of fact that cannot be resolved without weighing conflicting evidence. But where, as here, the facts are undisputed, the district court can make this determination as a matter of law. See Fed. R. Civ. P. 56(a). Here, Appellants failed to present any evidence to create a genuine issue of material fact concerning whether APCO had actual or constructive knowledge of the histoplasmosis risks associated with accumulations of bird manure. Therefore, the district court properly granted APCO's motion for summary judgment.[6]

---

[6] In the alternative, APCO argues -- as it did in the district court -- that its motion for summary judgment should be granted because Appellants cannot satisfy the causation element of their negligence claim. See Senkus, 535 S.E.2d at 727 (explaining that to prevail on a negligence claim based on premises liability, a plaintiff must show that the breach of a duty proximately caused an injury). The district court found it unnecessary to evaluate APCO's causation argument, having concluded that Mr. Hoschar could not satisfy the duty element of his negligence claim. While we note that there are serious causation concerns here, we need not address APCO's alternative argument inasmuch as our conclusion that APCO owed no legal duty to Mr. Hoschar is sufficient to affirm the district court's order granting APCO's motion for summary judgment.

V.

Pursuant to the foregoing, the district court's denial of Appellants' motion to remand and the district court's grant of APCO's motion for summary judgment is

AFFIRMED.